*NOT FOR PUBLICATION*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GIOVANNI GILLESPIE, | |
| Plaintiff, | Civil Action No. 21-20342 (FLW) |
| v. | **OPINION** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security[1], | |
| Defendant. | |

**WOLFSON, Chief Judge:**

Giovanni G. Gillespie ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and, accordingly, the ALJ's decision is **AFFIRMED**.

**I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff was born on February 10, 1994, and was 22 years old[2] at the alleged disability onset date of January 1, 2017. (Administrative Record ("A.R.") 28.) Plaintiff completed tenth

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

[2] Plaintiff is considered to be a "younger person" because he was under the age of 50 years old when he applied for disability benefits. *See* 20 CFR 404.1563(c).

grade prior to his alleged disability and has prior job experience as a clerk at a jewelry store and convenience stores. (A.R. 328.) Plaintiff alleges the following impairments: fibromyalgia, migraine/cluster headaches, hand and leg tremors, impulse control, bipolar disorder, and anxiety. (A.R. 32, 87, 327.) Plaintiff filed an application for disability benefits on November 14, 2018. (A.R. 25.) On November 23, 2018, Plaintiff filed an application for supplemental security income. (*Id*.) Plaintiff's applications were denied initially on January 25, 2019, and upon reconsideration on June 20, 2019. (*Id*.) Following these denials, Plaintiff filed a request for a disability benefits hearing. (*Id*.) On January 25, 2021, Plaintiff attended a telephone hearing and testified before Administrative Law Judge Peter R. Lee ("ALJ"). (*Id*.) After this hearing, the ALJ issued his decision, finding Plaintiff not disabled under the Act. (A.R. 40.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 30, 2021. (A.R. 1-6.) Thereafter, Plaintiff filed the instant appeal on December 3, 2021. (ECF No. 1.)

### A.   Review of the Medical Evidence

#### i.   *Physical Impairments*

The record establishes that prior to the alleged onset date of January 1, 2017, Plaintiff had reported a history of substance abuse that began at age 13. (A.R. 602.) However, as of January 1, 2017, Plaintiff reported no continued drug use. (A.R. 604.) In April 2017, Plaintiff visited neurologist, Dr. Haodong Song, M.D., with complaints of tremors and severe headaches lasting 20-45 minutes, three to four times per day. (A.R. 532.) Dr. Song suspected cluster headaches and prescribed Botox injections, Verapamil, and steroids. (A.R. 532, 568.) The following month, Plaintiff returned to see Dr. Song, because he complained of further migraines despite his prior Botox injection, but noted significant improvement after steroids and verapamil. (A.R. 531.) Dr.

Song prescribed another round of Botox injections, and continued Plaintiff's current dose of steroids and Verapamil. (*Id*.)

In November 2017, Plaintiff went to the Rheumatology Center of New Jersey for alleged myalgias, arthralgias, and joint pain all over with excessive fatigue. Dr. Ahmed Abdel-Megid, M.D., noted that Plaintiff's physical examination was "completely negative," and assessed Plaintiff with "joint disorder, unspecified." (A.R. 445.) Dr. Abdel-Megid suspected that Plaintiff's reported depression / anxiety and medication use could be the underlying reason for his alleged arthralgias and myalgias. (*Id*.)

That same month, Plaintiff also went to the Emergency Room at CentraState complaining of aches and pains all over the body. (A.R. 437.) At the emergency room, workup was done that suggested high Creatine Kinase (CK) levels, and Plaintiff was admitted for management of rhabdomyolysis. (*Id*.) Plaintiff received aggressive IV fluids and his headache medications were continued. (*Id*.) Although Dr. Rupa Panchal, MD., suggested that Plaintiff remain in the hospital pending further reduced CK levels, Plaintiff insisted on discharge and was released with instructions to follow up with his rheumatologist. (*Id*.)

At a follow-up appointment with Dr. Abdel-Megid in early December 2017, Plaintiff reiterated complaints of joint pains and fatigue. (A.R. 447.) However, Dr. Abdel-Megid found no active joint swellings or active synovitis to suggest any underlying connective tissue diseases or inflammatory arthritis. (A.R. 450.) Moreover, Plaintiff's physical exam was negative. (*Id*.)

On October 19, 2018, Plaintiff reported a headache lasting three days at a wellness visit with primary care physician, Dr. Vanessa Abrina, M.D. (A.R. 483.) Plaintiff's general objective exam was unremarkable, and Dr. Abrina noted that Plaintiff was awake, alert, not in distress, and ambulatory. (A.R. 484.) Dr. Abrina assessed Plaintiff with fibromyalgia and migraines, and

prescribed an antibiotic.  (*Id*.)  At a follow-up appointment in November 2018, Plaintiff alleged daily migraine headaches and fatigue.  (A.R. 482.)  His exam, however, was unremarkable.  (*Id*.)

Plaintiff also saw Dr. Song for treatment for his headaches and fibromyalgia on three occasions in 2018, and on multiple occasions in 2019, during which Dr. Song noted improvement with Botox, Verapamil, Neurontin.  (A.R. 521, 523, 525, 527, 562-63, 568, 570.)  On January 3, 2018, Plaintiff also had a "normal awake and drowsy routine EEG."  (A.R. 571.)  At an appointment with  Dr. Abrina in May 2019, Plaintiff stated that his migraine had improved with his current medications and medical marijuana.  (A.R. 572.)

In September 2019, Plaintiff underwent an MRI of the brain.  (A.R. 661.)  The MRI was unremarkable.  The following month, in October 2019, Plaintiff had a cervical MRI which was "normal."  (A.R. 662.)

In February 2020, Plaintiff was diagnosed with rheumatoid arthritis (RA) following immunology testing.  (A.R. 653.)  However, in June 2020, Plaintiff had a low Vectra score of 25 indicating a "low risk of radiographic progression."  (A.R. 635, 655.)  In July 2020, Plaintiff's Vectra score increased to 36, a score within the moderate range associated with "limited risk for radiographic progression."  (A.R. 657.)

In November 2020, Plaintiff returned to Dr. Song with complaints of cognitive symptoms, including worsening memory, in addition to headache.  (A.R. 685.)  Dr. Song opined that these symptoms were likely secondary and related to mood disturbance and medication side effects. (*Id*.)  Although Dr. Song noted that further adjustment of medication was likely necessary, he continued Plaintiff's prescriptions and Botox regimen. (A.R. 687)

4

ii.    *Mental Impairments*

Plaintiff also alleges disability due to several mental health conditions.  In April 2017, Plaintiff had a verbal altercation with his mother, and police transported him to CentraState Medical Center for a psychiatric evaluation.  (A.R. 421, 425.)  There, he complained of depression and insomnia that worsened since his wedding in February 2017.  (A.R. 421, 425.)  A mental health assessment revealed depressed and irritable mood, as well as signs of hopelessness, but otherwise indicated normal attention span, memory, orientation, speech, and judgment.  Plaintiff's attitude was guarded, but friendly.  (A.R. 427.)  Plaintiff also denied delusions, hallucinations, and suicidal ideations.  (A.R. 426-27.)  The on-call psychiatrist determined that Plaintiff did not meet the criteria of dangerous to self or others and Plaintiff was discharged with referral for outpatient services.  (A.R. 427.)

In September 2017, Plaintiff underwent an initial psychiatric evaluation at Stress Care of New Jersey ("SCNJ").  Plaintiff noted that he was in the process of applying for Social Security disability and reported migraines, anger issues, extreme mood swings, impulsive behaviors, and depression.  (A.R. 491.)  On examination, Chioma Obiukwu, N.P., found Plaintiff's appearance, grooming, and judgement to be fair.  (A.R. 492.)  Plaintiff's insight was fair / poor, and he was oriented in all spheres with appropriate affect and logical thought process.  However, Nurse Obiukwu observed that Plaintiff's behavior and mood was anxious.  (*Id*.)  Plaintiff denied delusions, hallucinations and any suicidal /homicidal thoughts at the time.  (*Id.*)  Nurse Obiukwu diagnosed Plaintiff with bipolar I disorder, most recent episode manic, severe without psychotic feature and detailed an initial treatment plan consisting of medication compliance and psychotherapy treatment.  (A.R. 493.)

At a follow-up visit with SCNJ in November 2017, Plaintiff reported anxiety but denied depression, manic / hypomanic mood, sleep difficulty, and obsessions. (A.R. 495.) On examination, Plaintiff's appearance and grooming were fair and his behavior was cooperative. (*Id*.) Plaintiff's psychomotor behavior and speech were normal. (*Id*.) His mood was anxious, but affect was appropriate. (A.R. 496.) In addition, Nurse Obiukwu noted fair insight and judgement, and logical form of thought, as well as orientation in all spheres. (*Id*.) Plaintiff denied delusions, hallucinations, and suicidal / homicidal ideation. (*Id*.)

SCNJ referred Plaintiff to Monmouth Medical Center Psychiatric Emergency Screening Services. Plaintiff had an appointment scheduled with Dr. Felix Geller, M.D., on December 14, 2017, but allegedly became frustrated in the office due to a scheduling mix-up, yelled at the secretary, and left without being seen. (A.R. 470.) At a follow-up appointment, Plaintiff reported remorse for his behavior, but explained that he has anger problems. (*Id*.) A social worker at Monmouth Medical Center noted Plaintiff's behavior as "cooperative," his mood as "euthymic," and his affect as "full range" in his behavioral health assessment (A.R. 469.) His assessment also indicated that he was working part-time at the time. (*Id*.)

Plaintiff returned to SCNJ on December 28, 2017. He reported "doing okay," and denied anxiety, depression, and manic / hypomanic mood, sleep difficulty, obsessions, and changes in weight and appetite. (A.R. 497.) Plaintiff also denied any new stressors. (A.R. 498.) On examination, N.P. Courtney Wuss assessed Plaintiff's behavior as calm and cooperative and his mood, euthymic, with fair insight and judgment. (*Id*.)

In 2018, Plaintiff attended seven medication management sessions at SCNJ. In all but one session, Plaintiff denied anxiety, depression, and manic/hypomanic mood. (A.R. 499-519.) On examination, he routinely was calm and/or cooperative, and exhibited logical, coherent thought

and orientation in all spheres.  (*Id.*)  Moreover, on six of the seven visits, the mental health professionals at SCNJ noted that Plaintiff's insight and judgment were fair.  However, on March 20, 2018, Plaintiff demonstrated poor insight and judgment on examination.  (A.R. 506.)  Plaintiff denied delusions, hallucinations, and suicidal/homicidal ideation at every session.  (A.R. 499-519.)

Plaintiff returned to SCNJ monthly for medication management between January and May 2019.  (A.R. 577-89.)  During that period, Plaintiff generally denied anxiety, depression, manic/hypomanic mood, memory issues, and speech difficulty.  (A.R. 577-589.)  However, in March 2019, during a comprehensive mental health intake assessment, Plaintiff stated that he was "tearful all the time," unable to leave his bed or home, unable to work or go to school, and had difficulties with focus and concentration.  (A.R. 584.)  On examination, Rachel Schwartz, LPC, found Plaintiff cooperative yet anxious, with normal affect, orientation, concentration, memory, and though process, as well as fair judgment, insight and impulse control.  (*Id.*)  Plaintiff also reported that he had last worked at a vapor shop on and off for six months in April 2018.  (A.R. 582.)  The following month at a medication management and psychotherapy session in April 2019, Plaintiff denied anxiety, depression, and manic/hypomanic mood. (A.R. 586.)  However, at a session in May 2019, Plaintiff complained that he was still "having daily mood swings," and "goes from euthymia to depression multiple times in a day."  (A.R. 588.)  During his session he denied anxiety and manic/hypomanic mood but admitted depression.  (*Id.*)

In August 2019, Dr. Geller of SCNJ completed a Medical Source Statement (MSS), in which he opined that Plaintiff had marked limitations in activities of daily living, maintaining social functioning, maintaining concentration, and decompensation.  (A.R. 615-19.)  Dr. Geller identified Plaintiff's own reports, and anecdotal spousal and parental information as the

information sources with respect to activities of daily living and social functioning.  (A.R. 615-16.)  As to concentration, Dr. Geller also identified Plaintiff's therapist as a source.  (A.R. 616.)

In April 2020, Ms. Schwartz, wrote a letter on Plaintiff's behalf, in which she stated that Plaintiff had been diagnosed with bipolar disorder, major depressive disorder, and generalized anxiety.  (A.R. 647-48.)  In her letter, Ms. Schwartz opined that Plaintiff is "struggling with crippling anxiety and depression which inhibits his ability to work."  (*Id*.)  She also noted that at times, his depression prevents him from leaving his home and his severe anxiety affects his ability to concentrate and maintain usual social contact.  (*Id*.)

### iii.    State Agency Opinions

On January 23, 2019, state-agency physician Mohammad Rizwan, M.D., assessed Plaintiff's external limitations and determined that Plaintiff retained the ability to occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk more than six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (A.R. 92-93).  Dr. Rizwan found no postural, manipulative, visual, communicative, or environmental limitations.  (*Id*.)  On June 5, 2019, state agency physician Cirilo Encarnacion, M.D., affirmed Dr. Rizwan's assessment, with the exception of the added limitation to avoid unprotected heights and other hazards.  (A.R. 108-09).

That same month, state agency psychologist, Nicholas Rios, Psy.D., reviewed the record and found Plaintiff had mild limitations in understanding, remembering, or applying information, and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.  (A.R. 90.)  Mr. Rios stated that the "[o]verall case file evidence indicates [Plaintiff] retains the capacity to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few

variables, little judgment; supervision required is simple, direct and concrete. UNSKILLED."
(A.R. 91). On review on June 10, 2019, state agency psychologist, Joseph Wieliczko, Psy.D.,
agreed with Mr. Rios' findings.  (A.R. 124-25.)

### B.     Review of Testimonial Record

#### i.     *Plaintiff's Testimony*

At the January 25, 2021 hearing before ALJ Lee, Plaintiff testified that his last, and only,
fulltime employment was as a jewelry salesperson in 2016.  (A.R. 55.)  Plaintiff stated that he no
longer worked at the jewelry store because of medical and mental health issues, including shaky
hands/tremors, body aches from standing for extended periods, migraine headaches that "come as
they please," anxiety, and depression.  (A.R. 57, 59.)  Plaintiff testified that he attended Marlboro
High School and Raise Academy, an alternative school for troubled youth, but had difficulty
following directions because of his dyslexia and hand tremors.  (A.R. 58.)  As a result of the hand
tremors, Plaintiff stated that it is very difficult for him to carry things and he drops items frequently.
(A.R. 61.)  Plaintiff testified that he experiences cluster headaches anywhere from two to four
times a day lasting anywhere from 45 minutes to two hours, and migraines a couple times a week
lasting six hours.  (A.R. 63-64.)  According to Plaintiff, he passes out every couple of days from
the headaches.  (A.R. 72.)  Regarding his mental health issues, Plaintiff stated that he experiences
terrible anxiety all day long and depression that limits his ability to do things in a timely fashion.
(A.R. 67.)  Plaintiff testified that he can stand for two hours and sit for three hours at a time. (A.R.
69.)  However, Plaintiff denied the ability to climb or bend over without pain.  (A.R. 70-71.)

With respect to daily activities, Plaintiff testified that he lives with his father-in-law and
his wife.  (A.R. 74.)  He noted that on a typical day, he spends a couple of hours in bed in the

morning and forces himself to eat.  (*Id.*)  Plaintiff stated that he is capable of preparing himself

meals at times, but does not do any chores around the house.  (A.R. 75.)

ii.     *Vocational Expert's Testimony*

Vocational Expert, Michael Galloway (the "VE") began his testimony by classifying

Plaintiff's past employment at the jewelry store according to the Dictionary of Occupational Titles

("DOT").  (A.R. 76.)  The VE classified the salesperson job as "sales clerk," DOT # 290.477-014,

an unskilled position with a SVP level of 2.  (*Id.*)  Turning to hypotheticals, the ALJ asked the VE

whether Plaintiff could perform his past work if he assumes light exertional level with the

following limitations: "never climb ropes, ladders or scaffolds, never be exposed to unprotected

heights or hazardous machinery, occasionally climb stairs and ramps, never crawl, occasionally

kneel, occasionally stoop and crouch, frequent fingering – frequent reaching, fingering and

handling, frequently balance, able to wear tinted lenses, never exposure to extremes in noise

environments, . . . occasional contact with supervisors, co-workers and the public, and able to do

only simple and routine tasks."  (A.R. 76-77.)  The VE initially replied that Plaintiff would be able

to perform his past work.  (A.R. 77.)  However, when reminded that the hypothetical included

occasional contact with the public, the VE admitted that according to the DOT, working in a

jewelry store might have more than occasional contact with the public.  (A.R. 79.)  As such, the

VE testified that Plaintiff would not be able to perform his past work as a jewelry store salesclerk.

(A.R. 80.)  Nonetheless, the VE also testified that Plaintiff could perform the positions of Small

Products Assembler, DOT # 706.684-022, Marker in the Retail Trade, DOT # 209.587-034, and

Routing Clerk, DOT #222.687-022.  (A.R. 77-78.)  All three positions are unskilled with an SVP

of 2 and require light exertion.  (*Id.*)  Under the second hypothetical, the ALJ asked whether,

assuming the same conditions, any work would be available if the individual were off-task at least

10

15 percent or more of the workday, absent from work three or more days per month.  (A.R. 78.)
The VE opined that under the off-task hypothetical, there were no other positions within the
national economy for an individual so situated as Plaintiff.  (*Id*.)  Plaintiff's attorney also posed
two hypotheticals to the VE involving off task time for two to four hours a day due to headaches
and inability to carry anything during the day.  (A.R. 81-82.)  The VE testified that the three jobs
would be eliminated under both hypotheticals.  (*Id*.)

*iii.*     *Third-Party Function Report*

Plaintiff's mother, Roseanne Gillespie, completed a Third-Party Function Report on
December 27, 2018.  (A.R. 339-46.)  Ms. Gillespie claims that Plaintiff's conditions affect his
ability to lift, squat, bend, stand, reach, walk, talk, hear, climb stairs, see, remember, complete
tasks, concentrate, follow instructions, use hands, and get along with others.  (A.R. 344.)  For
example, Ms. Gillespie wrote that when lifting, shoulder and neck pain causes migraines, and
Plaintiff's memory, concentration, and ability to follow instructions are greatly impaired by
medications.  (*Id*.)  She indicated that Plaintiff has no issues with authority figures, but cannot
handle stress or "change in any form."  (A.R. 345.)  As to Plaintiff's activities of daily living, Ms.
Gillespie reported that Plaintiff's day is "completely dictated by level of pain and his bipolar
disorder."  (A.R. 339.)  If his pain is tolerable and his mania is in check, he attempts to have a
productive day, but soon succumbs to fatigue.  (*Id*.)  Ms. Gillespie indicated that pain from cluster
headaches, vomiting, and nausea affect Plaintiff's sleep, and he needs to be reminded to take care
of his personal care and grooming.  (A.R. 340.)  According to Ms. Gillespie, Plaintiff occasionally
organizes his things, but most chores are done by, or with, family.  (A.R. 341.)  She stated that he
only leaves his home for doctor's appointments because of his fears and anxiety of crowds and
loud noises, and would rather be driven than drive alone.  (A.R. 342.)  As for hobbies and interests,

11

Ms. Gillespie noted that Plaintiff enjoys reading, watching television, and playing video games, but cannot read for too long because of his migraines.  (A.R. 343.)  Socially, Ms. Gillespie stated that Plaintiff attempts to keep in touch with his childhood friends on the phone and computer once or twice a month and regularly attends therapy.  (*Id*.)  However, Ms. Gillespie noted that when Plaintiff has a manic episode, he is likely to be combative, irritable, and inappropriate with others. (A.R. 344.)

### C.    The ALJ's Findings

On March 16, 2021, the ALJ issued a written decision examining whether Plaintiff satisfied his burden of demonstrating disability under the standard five-step sequential evaluation process. (A.R. 28-41.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2017, the alleged onset date of disability.  (A.R. 28.)  At step two, the ALJ found Plaintiff's fibromyalgia, rheumatoid arthritis, migraine/cluster headaches, obesity, bipolar disorder and anxiety were severe impairments, but determined that Plaintiff's history of substance abuse was non-severe.  (*Id*.)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id*.)  Specifically, the ALJ considered listings 1.02, major dysfunction of a joint(s); 14.09, inflammatory arthritis; and mental health impairment listings, 12.04 and 12.06. Although there are no listing criteria specific to evaluating obesity, SSR19-2p states that, "functional limitations caused by the MDI of obesity, either alone or in combination with another impairment(s), may medically equal a listing."  However, here, the ALJ determined that obesity in combination with the Plaintiff's other impairments has not resulted in functional limitations that medically equal the severity of a listing.  As to Listing 1.02, the ALJ found that Plaintiff's

conditions did not meet major dysfunction of a joint(s), because the record does not establish inability to ambulate effectively, *i.e.*, use of a hand-held device that limits the functioning of both upper extremities.  (A.R. 29.)  Similarly, as to Listing 14.09, the ALJ concluded that despite Plaintiff's RA diagnosis, his impairments did not meet or medically equal the listing criteria, in part, because "the evidence does not demonstrate the inability to ambulate effectively or to perform fine and gross movements effectively."  (*Id*.)  Turning to Plaintiff's mental health conditions, the ALJ determined that Plaintiff's impairments, considered singly and in combination, did not meet the criteria of listings 12.04 and 12.06 because the "paragraph B" and "paragraph C" criteria were not met.  (*Id*.)  "Paragraph B" criteria are satisfied when the mental impairments result in at least one extreme or two marked limitations in the following broad areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  Here, the ALJ determined that Plaintiff had "moderate" limitations in all areas of functioning.  (A.R. 30-31.)  Because the ALJ did not find at least two marked limitations or one extreme limitation, the ALJ concluded that the "paragraph B" criteria were not met.  (A.R. 31.)  In addition, the ALJ found that the evidence failed to establish the "paragraph C" criteria as the record shows more than "minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life."  (*Id*.)

At step four, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work except:

> he can frequently balance; occasionally climb ramps and stairs, kneel, stoop and crouch; never crawl or climb ladders, ropes or scaffolds; never be exposed to unprotected heights or hazardous machinery; and frequently reach, finger and handle bilaterally. He must be able to wear tinted lenses and can never have exposure to extremes in noise environments (e.g., a rock concert). The claimant can have occasional contact with supervisors, co-workers and the public; he is able to do only simple and routine tasks.

13

(A.R. 32.)   In making this determination, the ALJ explained that a light exertional capacity limitation with postural restrictions, including never crawling or climbing ladders, ropes, or scaffolds, was appropriate considering Plaintiff's RA and fibromyalgia, in combination with his obesity.   (A.R. 35.)   In addition, the ALJ endorsed limitations to frequent performance of manipulative functions, *i.e.*, reaching, fingering, and handling, with the bilateral upper extremities, due to Plaintiff's RA and/or tremors.  (A.R. 35-36.)  The ALJ further explained that evidence of Plaintiff's migraine/cluster headaches supported associated limitations, including no exposure to unprotected heights or hazardous machinery, ability to wear tinted lenses at work, and no exposure to extreme noise environments, such as loud concerts.  (A.R. 36.)  Finally, in accordance with the ALJ's findings of "moderate" limitations in each of the "paragraph B" criteria, the ALJ limited Plaintiff to only simple routine tasks with occasional contact with supervisors, co-workers, and the public.  (A.R. 37.)  Given Plaintiff's RFC, the ALJ found that he could not perform his past relevant work as a jewelry store clerk.  (A.R. 39.)

However, at step five, ALJ determined that given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (*Id*.)  Specifically, the ALJ found that the occupations of Small Products Assembler, Marker, and Routing Clerk exist in "significant numbers" in the national economy. (A.R. 40.)  In sum, the ALJ concluded that Plaintiff had not been under a disability as defined in the Social Security Act, from January 1, 2017, through the date of his decision on March 16, 2021. (*Id*.)

## II.   <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924, 113 S. Ct. 1294, 122 L. Ed. 2d 685 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or

mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id*. A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for

purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id*.

## III.   PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff advances two arguments on appeal. First, Plaintiff contends that the ALJ failed to properly evaluate and explain his analysis of the opinion of treating psychiatrist, Dr. Felix Geller, M.D. (*See* Plaintiff's Moving Brief ("Pl. Br.") at 9-15.) Second, Plaintiff argues that there

was an unresolved conflict between the vocational testimony and the RFC which the ALJ adopted. (Pl. Br. 16-20.)  The Court addresses each argument, in turn.

### A.      The ALJ Properly Evaluated Dr. Geller's Opinion

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ improperly discounted Dr. Geller's opinion.  In particular, Plaintiff claims that the ALJ did not provide sufficient reasons to find the opinion of Dr. Geller unpersuasive.  (Pl. Br. at 11.)  In that regard, Plaintiff asserts that the ALJ improperly stated that the restrictions noted by Dr. Geller are not consistent with the other evidence of record and the psychiatric progress notes. I disagree, and find that despite the existence of certain evidence in the record that supports Dr. Geller's assessment, the ALJ properly considered Dr. Geller's opinion under the revised Social Security regulations.

Because Plaintiff's claim was filed after March 27, 2017, new regulations apply to the ALJ's evaluation of medical opinions.  Significantly, the new regulations have eliminated the "treating source rule," which formerly permitted ALJ's to assign controlling weight to opinions from treating physicians.  *See* 20 C.F.R. §§ 404.1520c(a) , 416.920c(a).  Rather than assigning weight to those types of opinions, when analyzing a medical opinion, recent SSA regulations require the ALJ to determine the persuasiveness of that opinion based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other facts that tend to support or contract a medical opinion or prior administrative medical finding. C.F.R. § 404.1520c(c).  Critically, the regulations note that the "factors of supportability and consistency are the most important factors" in determining persuasiveness.  C.F.R. § 404.1520c(b)(2).  As to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)

or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." C.F.R. § 404.1520c(c)(1).  As to consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." C.F.R. § 404.1520c(c)(2). Importantly, if a treating physician's opinion conflicts with the medical record, the ALJ may nonetheless accord that opinion less weight, or even reject it outright, so long as a reasonable explanation is given.  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Ramos v. Colvin*, No. 14-3971, 2016 WL 1270759, at *5 (D.N.J. Mar. 31, 2016) ("An ALJ can reject a treating physician's opinion . . . where the opinion is . . . inconsistent with other substantial evidence of record." (citation and internal quotation marks omitted)). In other words, the ALJ may discredit a treating physician's opinion that is supported by other evidence in the medical record provided that she or he has considered the evidence in its entirety.  *Plummer*, 186, F.3d at 429.

Here, the ALJ appropriately considered Dr. Geller's opinion in accordance with the revised regulations and determined that Dr. Geller's opinion was not persuasive.  On August 6, 2019, Dr. Geller completed a Medical Source Statement ("MSS") for "Anxiety-Related Disorders" in which he opined that Plaintiff suffered "marked" limitations in several areas of mental functioning, including in activities of daily living, maintaining social functioning, maintaining concentration, and decompensation.  (A.R. 615-19.)  The ALJ found Dr. Geller's opinion not persuasive.  In so doing, the ALJ explained that "marked limitations are not supported by objective evidence within the MSS," and "are not consistent with the other evidence of record, including psychiatric progress notes."  (A.R. 38.)  As an example of the latter, the ALJ notes that "on mental status examination of April 15, 2019, the claimant was calm, with good appearance and grooming, euphoric mood

and appropriate affect, logical form of thought, cognition oriented in all spheres, and good insight and judgment.  He also denied any delusions, hallucinations and suicidal/homicidal ideation." (*Id.*) As such, the ALJ concluded that the evidence of record supports no more than moderate mental functional limitations, which are consistent with the mental and social limitations included in the RFC. (*Id.*)

As to supportability, Plaintiff argues that the ALJ's statement that Dr. Geller's marked limitations are not sufficiently supported and are inconsistent with psychiatric progress notes is offered without sufficient explanation. (Pl. Br. at 13.)  In that regard, Plaintiff contends that the ALJ conflated the physician's notes for the purposes of treatment and his ultimate opinion regarding Plaintiff's ability to work.  I disagree.  First, the ALJ explains that Dr. Geller's "marked limitations are not supported by objective evidence within the MSS." (A.R. 38.)  In several of the explanations provided in the MSS, Dr. Geller cites Plaintiff, Plaintiff's parents, and Plaintiff's wife as the sources of the information. (A.R. 615-616.)  For example, although Dr. Geller opines that Plaintiff has marked difficulties in maintain social functioning, his explanation is limited to reporting of a "significant decrease in [] social functioning" by "[t]he client[,] his wife[,] and his parents." (A.R. 616.)  However, "the mere memorialization of a claimant's subjective complaints in a medical record does not transform those complaints into objective findings or a medical opinion." *David K. v. Kijakazi*, No. 20-12419, 2022 WL 225451, at *8 (D.N.J. Jan. 26, 2022) (citing *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005)).

In addition, Plaintiff argues that the ALJ did not point to genuine inconsistencies between Dr. Geller's opinion and his treatment notes. (Pl. Br. at 13.)  In that connection, Plaintiff asserts that the ALJ impermissibly relies on examination findings of appropriate affect, logical form of thought, and cognition oriented in all spheres to find Dr. Geller's opinion not persuasive, without

explaining how the notes are relevant as to Plaintiff's anxiety.  (*Id.*)  Plaintiff's argument, however, mischaracterizes the ALJ's explanation.  As noted above, the ALJ cited an example of a SCNJ psychiatric progress note from April 2019 that is relevant to Plaintiff's alleged anxiety, in which Plaintiff was found to be calm, with euphoric mood, fair insight and judgment, in addition to exhibiting appropriate affect, logical form of thought and cognition oriented in all spheres. Although Dr. Geller did not author this particular progress note, it is consistent with other progress notes signed by Dr. Geller.  Indeed, Dr. Geller saw Plaintiff five times from October 2018 through May 2019.  In October and December 2018, and January 2019 sessions, Dr. Geller recorded that the Plaintiff had denied anxiety, depression, and manic/hypomanic mood, among other issues. (A.R. 514-15, 517-18, 577-78, 609.)  Additionally, at these three visits, Dr. Geller found Plaintiff's mood to be euthymic, his behavior cooperative, and his insight/judgment fair.  (*Id.*)  At Plaintiff's fourth visit with Dr. Geller in February 2019, Dr. Geller recorded the same findings on examination, but also noted in narrative form that Plaintiff was "doing ok," with "[n]o acute issues."  (A.R. 579.)  Finally, on May 6, 2019, although Dr. Geller noted that Plaintiff was "not doing as well" and had reported "go[ing] from euthymia to depression in a day multiple times," on examination, Dr. Geller nonetheless found that objectively, Plaintiff was cooperative and exhibited euthymic mood, appropriate affect, logical form of thought, orientation in all spheres and fair insight and judgment.  (A.R. 588, 598.)  In sum, these psychiatric notes offer little objective support for Dr. Geller's marked limitations in his MSS.  Thus, having reviewed the MSS, and the psychiatric notes authored by Dr. Geller, I find that the ALJ appropriately considered supportability.

As to consistency, Plaintiff argues that the ALJ inaccurately stated that the restrictions assessed by Dr. Geller are not consistent with other evidence of the record.  To that end, Plaintiff

notes that Rachel Schwartz, LPC, reported in a letter that "Mr. Gillespie is struggling with crippling anxiety and depression which inhibits his ability to work." (A.R. 695.) As to concentration and social relationships, Ms. Schwartz stated that "[a]t times, his depression caused the inability for him to leave his home. Mr. Gillespie suffers from severe anxiety which affects his ability to concentrate and maintain usual social conduct." (*Id.*) However, the ALJ did not find Ms. Schwartz's opinion to be persuasive as it made general statements regarding Plaintiff's condition affecting his ability to concentrate and maintain usual social conduct without "providing a function-by-function analysis of specific mental work tasks or specifying the degree(s) of limitation for same." (A.R. 39.) Further, the ALJ noted that as a Licensed Professional Counselor, ("LPC"), Ms. Schwartz is not an "acceptable medical source" under the disability Regulations. (*Id.*) I agree with those assessments.

Nonetheless, the fact that there is some "evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Sassone v. Comm'r of Soc. Sec.*, 165 Fed. App'x 954, 955 (3d Cir. 2006) (citation omitted). Here, the ALJ noted that Dr. Geller's opinion was inconsistent with other medical records, including psychiatric notes authored by other mental health professionals. As noted above, the ALJ cites a mental status examination from April 15, 2019, wherein Plaintiff was found to be in euphoric mood and calm, with good appearance and grooming, as well as logical thought, orientation in all spheres and good insight and judgment. (A.R. 600.) This progress report is also largely consistent with findings from mental status examinations by other SCNJ professionals on December 28, 2017, January 23, 2018, and May 16, 2018. (A.R. 498, 500, 508-09.) Moreover, the ALJ cites to other non-SCNJ records in his opinion that are inconsistent with Dr. Geller's opinion. For example, the ALJ noted a mental status assessment

from Plaintiff's visit to the Emergency Room in April 2017 that documented Plaintiff as tearful but oriented, with clear speech, normal affect, and short and long-term memory, normal speech, and normal judgment.  (A.R. 29, 424, 426.)  The ALJ also cited a doctor's visit with Dr. Abrina in May 2019 for migraines, in which Dr. Abrina found Plaintiff cooperative, well oriented, and exhibiting no signs of mood swings or psychotic features.  (A.R. 574.)  Dr. Abrina also described Plaintiff's insight as "good" and his memory and judgment as "intact."  (*Id*.)  What is more, the ALJ found the state agency psychologists' opinions that despite his limitations, Plaintiff could perform a range of unskilled work partially persuasive.  (A.R. 90, 124-25.)  Therefore, reviewing the ALJ's opinion holistically, I find ample evidence in support of the ALJ's consistency determination.  *See Jones*, 364 F.3d at 505 (finding that "the ALJ's decision, read as whole," offered "sufficient explanation"); *Cacere v. Comm'r of Soc. Sec.*, 189 Fed. Appx. 59, 63 (3d Cir. 2006) ("viewing the ALJ's decision as a whole," the court of appeals found the "ALJ's reasoning was sufficient").  Because "[my] inquiry is not whether the ALJ could have reasonably made a different finding based on this record[,]" but rather "whether the ALJ's actual findings are supported by substantial record evidence," *Simmonds*, 807 F.2d at 58, and substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate," the evidence in support of the ALJ's consistency determination easily meets this threshold.  *Plummer*, 186 F.3d at 427 (internal quotations and citations omitted).

### B.  There Was No Unresolved Conflict between the VE Testimony and the RFC

Plaintiff further argues that there was an apparent, unresolved conflict between the vocational testimony and the RFC adopted by the ALJ.  (Pl. Br. at 16-20.)  Plaintiff claims that the ALJ failed to comply with SSR 00-4p, which details an ALJ's affirmative responsibility to inquire about conflicts between VE testimony and the DOT.  (*Id*. at 18.)  Specifically, Plaintiff disputes

the VE's testimony that Plaintiff could perform the job of Assembler, Small Products, DOT # 706.684-022, a position that requires work as a member of an assembly group, passing units to another worker, considering the RFC's limitation that Plaintiff may only have "occasional contact with supervisors, coworkers and the public." (A.R. 20.)

In evaluating a claimant's application for benefits, the ALJ is required to: (1) ask, on the record, whether a VE's testimony is consistent with the DOT; (2) elicit a reasonable explanation where an inconsistency appears, and (3) explain in its decision how the conflict is resolved. *Zirnsak v. Colvin*, 777 F.3d 607, 617 (3d Cir. 2014). The Third Circuit has emphasized that the presence of inconsistencies does not mandate remand, unless substantial evidence is lacking in other portions of the record that can form an appropriate basis to support the result. *Id*. (citing *Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2004)).

In the instant case, the VE confirmed that his testimony was based on, and in accordance with, the DOT where the DOT provides guidance and, on his education, and professional experience where the DOT does not give guidance. (A.R. 78-79.) Despite Plaintiff's argument to the contrary, I find that no apparent inconsistency sufficient to trigger the ALJ's obligation to elicit a reasonable explanation. The DOT small parts assembler description states: "Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker." Dot Code 706.684-022. Plaintiff posits that passing units to other workers in an assembly group requires more than occasional interaction with co-workers. This argument, however, has been rejected by several courts that have found no conflict between the assembler, small products role, and an occasional interaction limitation. *See Spears v. Saul*, 842 F. App'x 107, 109-10 (9th Cir. 2021) (finding no obvious or apparent conflict between the VE's testimony that the claimant could still perform jobs involving benchwork because such jobs do not require

being around many people, and the claimant's limitation on interacting with coworkers); *Cruz v. Berryhill*, No. 16-05910, 2017 WL 6450491, at *18 (N.D. Cal. Dec. 18, 2017) (observing that passing units to another worker does not present an obvious or apparent conflict with an occasional interaction limitation); *Richardson v. Berryhill*, No. 18-0044, 2019 WL 4764834, at *9 (D. Conn. Sept. 30, 2019) (finding no apparent conflict between RFC of routine tasks with occasional interaction with others and DOT description of Assembler position as it "simply requires the individual to perform her discrete part of the assembling process independently and then hand it off to the next person along the assembly line," allowing for independent work with limited interaction with others); *Hopper v. Colvin*, No. 13-01525, 2014 WL 6473566, at *9 (D. Or. Nov. 14, 2014) (VE's testimony that an individual could perform assembly task while limited to "occasional co-worker contact, but no teamwork assignments does not conflict with the DOT, which describes interactions with people as not significant") (internal quotations omitted); *But see Veteto v. Colvin*, 2014 WL 412414, at *4 (D. Or. Feb. 3, 2014) (holding that because "it is unclear whether the job of a small products assembler would require more than 'occasional ... coworker interaction' . . . the ALJ had a duty to further develop the record").

Notably, the DOT description for small assembler, small products, has a "People" level of 8, the lowest rating in the "People" category numbered 0-8, for the type of social interaction each occupation requires. *Tracey v. Comm'r Soc. Sec.*, 760 F. App'x 121, 124 (3d Cir. 2019). A job with a social interaction level of "8" means that "the degree of relation to people required for that position is [n]ot [s]ignificant." *Scott C. v. Comm'r of Soc. Sec.*, No. 20-109, 2021 WL 2682276, at *5 (D. Vt. June 30, 2021). Courts have determined that level 8 interaction is compatible with an RFC limitation of only superficial contact with coworkers, supervisors, and the public. *See Sweeney v. Colvin*, No. 13-2233. 2014 WL 4294507, at *17 (M.D. Pa. Aug. 28, 2014) (listing

cases); *Samantha T. v. Comm'r of Soc. Sec.*, No. 20-201, 2021 WL 3566597, at *4 (W.D.N.Y. Aug. 12, 2021) (noting that small products assembler involves "level 8" interaction); *Larsen v. Astrue*, No. 10–00936, 2011 WL 3359676, at *15 (E.D. Cal. Aug. 3, 2011) (jobs with "not significant" level of interaction in DOT appropriate for claimants with RFC specifying limited or occasional coworker contact). Thus, the Court finds that the Assembler, Small Products position, with its low "People" category of 8, is likewise compatible with an RFC limitation of minimal contact with coworkers, supervisors, and the public. Accordingly, no conflict exists between the VE's testimony that the Plaintiff could perform the position of Assembler, Small Products and the limited interaction limitation in the RFC adopted by the ALJ.[3]

## IV.   **CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is **AFFIRMED**. An appropriate Order shall follow.

Dated: September 2, 2022                                      /s/ Freda L. Wolfson
                                                             Hon. Freda L. Wolfson
                                                             U.S. Chief District Judge

---

[3]     Even had the VE's testimony conflicted with the DOT, the VE identified two additional jobs that Plaintiff could perform: Marker, DOT #209.587-034 (129,000 jobs nationally) and Routing Clerk, DOT # 222.687-022 (104,000 jobs nationally). (A.R. 40, 75-79). Additionally, Plaintiff's claim that the ALJ did not actually make a finding as to whether these jobs exist in significant numbers in the national economy is incorrect. Indeed, the ALJ explicitly stated in reference to the marker and routing clerk positions that he "find[s] that these occupations [] exist in 'significant numbers' in the national economy." (A.R. 40.)